| | | |
|---|---|---|
| STATE OF SOUTH DAKOTA | ) | IN CIRCUIT COURT |
| | ) SS. | |
| COUNTY OF PENNINGTON | ) | SEVENTH JUDICIAL CIRCUIT |

RUSSELL ALLGIER,                              )            51CIV21-00_____
                                             )
                Plaintiff,                   )
                                             )
    vs.                                      )            **SUMMONS**
                                             )
OPEN MORTGAGE, LLC,                          )
                                             )
                Defendant.                   )

THE STATE OF SOUTH DAKOTA TO THE ABOVE-NAMED DEFENDANT, GREETINGS:

YOU ARE HEREBY SUMMONED AND REQUIRED to serve upon Jason M. Smiley,

Ali J. Schaefbauer, and Katelyn A. Cook of Gunderson, Palmer, Nelson & Ashmore, LLP, at

P.O. Box 8045, Rapid City, South Dakota 57709-8045, an answer to the Complaint which is

herewith served upon you, within thirty (30) days after the service of the Summons and

Complaint upon you, exclusive of the date of service.  If you fail to do so, judgment by default

will be taken against you for the relief demanded in the Complaint.

Dated:  April 7, 2021.

GUNDERSON, PALMER, NELSON
& ASHMORE, LLP

By_____
          Jason M. Smiley
          Ali J. Schaefbauer
          Katelyn A. Cook
          Attorneys for Plaintiff
          P.O. Box 8045
          Rapid City, SD  57709-8045
          (605) 342-1078

**EXHIBIT**
A

| | | |
|---|---|---|
| STATE OF SOUTH DAKOTA | ) | IN CIRCUIT COURT |
| | ) SS. | |
| COUNTY OF PENNINGTON | ) | SEVENTH JUDICIAL CIRCUIT |

| | | |
|---|---|---|
| RUSSELL ALLGIER, | ) | 51CIV21-00_____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **COMPLAINT** |
| | ) | |
| OPEN MORTGAGE, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Russell Allgier, by and through Jason M. Smiley, Ali J. Schaefbauer, and Katelyn A. Cook of Gunderson, Palmer, Nelson & Ashmore, LLP, for his Complaint against Defendant, states and alleges as follows:

### JURISDICTION AND VENUE

1. Plaintiff is a resident of Pennington County, South Dakota.

2. Defendant Open Mortgage, LLC, ("Open Mortgage") is a Texas limited liability company doing business in Pennington County, South Dakota.

3. Plaintiff was an employee of Open Mortgage's Rapid City branch and at all times relevant to this Complaint was in Rapid City.

4. Every action giving rise to this Complaint took place in Rapid City or was due to Open Mortgage's operation of a business in Rapid City.

5. Jurisdiction and venue are proper with this Court pursuant to SDCL §§ 15-5-1 and 15-7-2.

6. Each allegation of the Complaint is incorporated into every count of the Complaint as if fully set forth.

## GENERAL ALLEGATIONS

7.  Russell Allgier ("Allgier") began working as an employee at Open Mortgage on March 28, 2019.

8.  At Open Mortgage, Allgier was the Branch Manager of the Rapid City branch of Open Mortgage.

9.  Allgier managed the Rapid City Branch and also worked to originate home loans on behalf of Open Mortgage.

10.  As Branch Manager, Allgier was compensated pursuant to Open Mortgage's Branch Manager Compensation Plan, a true and correct copy of which is attached as **Exhibit A.**

11.  Allgier was compensated based on the Rapid City Open Mortgage branch's profit. The simple breakdown of his compensation is that he would receive the net profits of the branch after all expenses.

12.  Allgier was terminated from employment with Open Mortgage on December 22, 2020.  The net profit payable to Allgier as of that date was $62,000.00.

13.  At the time of his termination, Allgier spoke with Brian Roe and Joann Nolte of Open Mortgage to confirm that he was entitled to the $62,000.00 and the incoming funds from loans not yet closed, also known as pipeline loans.  Brian Roe and Joann Nolte confirmed that was true and promised that he would receive his compensation.

14.  As of April 1, 2021, Allgier has not received the $62,000.00 he was owed from December 22, 2020, nor has he received any income from the pipeline loans.

15.  Allgier does not have access to Open Mortgage's accounting software and, therefore, is unable to ascertain at this time how much he is owed for the pipeline loans.

2

16.  Furthermore, on or about March 28, 2019, Allgier signed a Non-Competition, Non-Solicitation, and Confidentiality Agreement (the "Non-Compete Agreement").  A true and correct copy of this agreement is attached hereto as **Exhibit B**.

17.  Section 5.2 of Exhibit B contains the non-compete and non-solicitation language. The Non-Compete Agreement purports to prohibit an employee from working in the same or similar function for one year after leaving Open Mortgage, regardless of whether the termination was voluntary or involuntary, anywhere within the designated territory.

18.  Section 5.2 of the Non-Compete Agreement goes on to provide the definition of "Territory":

> If Employee is in a position where Employee's responsibilities are not geographically limited to an assigned location or territory or where Employee is provided Confidential Information that is not geographically limited to an assigned region or territory (such as, by way of example but not limitation, management positions), then Territory means the United States and each additional country (including state and state-equivalents and county and county-equivalents within those countries) in which the Company is doing business as of Employee's termination date.

19.  The Non-Compete Agreement allows for Limited Waiver, as set forth in Section 5.3, which provides:

> If Employee believes that employment with a Competing Business will not injure or infringe on the Company's legitimate interests, Employee agrees to notify the Company and engage in a dialogue and exchange information regarding the contemplated employment so that the Company can determine whether, in its exercise of sole discretion, a limited carve-out from the non-compete should be allowed.

20.  At multiple times throughout the summer of 2020, Allgier notified Open Mortgage that he was interested in leaving Open Mortgage and working at another mortgage company in Rapid City, South Dakota.

3

21. Allgier, in compliance with the Non-Compete Agreement, notified Open Mortgage and began a dialogue about his possible employment with another mortgage company.

22. In response, on October 12, 2020, Allgier received a voicemail, which is transcribed as follows:

> Hey Russ, it's Flash in Austin. Sorry it's so late when I'm calling, I meant to call earlier this afternoon and got stuck going to pick up a prescription.
>
> Anyway, I have heard the news through the grapevine, of course Tana's heard the news, that after Tyler leaving you're thinking about splitting. And she had an idea and discussed it with me that might help a little, I don't know. And that is that we could modify your non-solicit or employee agreement. And we had Tony look at it and change a line or two so that it would allow you to, um, recruit sales people in your branch if everybody else wants to go with you somewhere, that would be okay. It says not ops people because of course we want to keep ops people.
>
> But I can have Tony send that to you which would at least free you up if you want to talk to all the people in your branch, uh, to see if they would want to do something else with you. That's Tony's idea, which I thought was kind of a good idea.
>
> And that's the update. I'll talk to Tony and have him send you a copy.
>
> Doesn't mean you have to go. Anyway, it's just an offer.
>
> Alright – talk to you later.

23. The voicemail is from Scott Gordon, the founder and CEO of Open Mortgage, who goes by Flash.

24. Allgier did receive an updated non-compete and non-solicitation agreement based on the voicemail from Scott Gordon. A true and correct copy of the Amendment to the Non-Competition, Non-Solicitation, and Confidentiality Agreement (the "Amendment") is attached hereto as **Exhibit C**.

25. Allgier signed and returned the Amendment to Open Mortgage. Allgier does not know if Open Mortgage signed the amended contract; however, Open Mortgage's actions and

4

further communications with Allgier constitute consent to the Amendment or ratification of the Amendment.

26. Allgier has a current offer for employment from a mortgage company with a branch in Rapid City, South Dakota that he would like to accept.

## COUNT ONE
### BREACH OF CONTRACT

27. Allgier realleges and incorporates by reference the allegations contained in the preceding paragraphs.

28. The Branch Manager Compensation Plan between Allgier and Open Mortgage is a binding contract.

29. Open Mortgage breached this contract when it refused to pay Allgier the compensation he is owed under the Branch Manager Compensation Plan.

30. Allgier claims damages of unpaid compensation in the amount of $62,000.00, as well as the pipeline loan profit, plus interest and costs in such other amount as will be proven at trial.

## COUNT TWO
### OPPRESSIVE, FRAUDULENT, OR MALICIOUS CONDUCT
### PURSUANT TO SDCL § 60-11-7

31. Allgier realleges and incorporates by reference the allegations contained in the preceding paragraphs.

32. Allgier is entitled to receive compensation for his work through his last day of employment and Open Mortgage has provided no viable or valid reason for refusing to provide Allgier with his compensation.

33. Open Mortgage's conduct has been oppressive, fraudulent, or malicious in failing to pay Allgier's compensation.

5

34.   Therefore, pursuant to SDCL § 60-11-7, Allgier is entitled to double the amount of wages owed to Allgier.

**COUNT THREE**
**DECLARATORY JUDGMENT**

35.   Allgier realleges and incorporates by reference the allegations contained in the preceding paragraphs.

36.   Pursuant to SDCL § 21-24-1, this Court has the ability to construe the Non-Compete Agreement at issue, prior to any breach by Allgier, and issue a declaratory judgment, declaring the rights of the parties to the Non-Compete Agreement.

37.   The parties amended the Non-Compete Agreement consistent with the terms of the Amendment.

38.   Open Mortgage has waived the right to enforce the non-compete and non-solicitation agreements, based on the voicemail dated October 12, 2020, the Amendment, and other conduct which led Allgier to believe the Non-Compete Agreement had been amended.  Open Mortgage must be estopped from asserting the Non-Compete Agreement to prevent Allgier from gainful employment.

39.   In the alternative, if the Non-Compete Agreement has not been waived, then it is overbroad in scope and geographical area and thus unenforceable.

40.   Allgier seeks a declaratory judgment that because the Non-Compete Agreement has been modified or waived by the conduct of Open Mortgage, or in the alternative is overbroad and unenforceable, Allgier will not be in breach of contract should he accept the pending offer of employment.

WHEREFORE, Plaintiff requests judgment as follows:

A.  For compensatory damages in the amount of $62,000.00 plus interest or such other amount as proved at trial and prejudgment interest from the date that Plaintiff's loss or damage occurred;

B.  For double the measure of damages owed to Allgier as unpaid compensation derivative of employment with Open Mortgage pursuant to SDCL § 60-11-7;

C.  For a Declaratory Judgment that the non-compete and non-solicitation provisions of the Non-Compete Agreement are unenforceable, and/or waived by the conduct of Open Mortgage;

D.  For Plaintiff's costs and disbursements incurred herein;

E.  For such other and further relief as the Court deems fit.

Dated:  April 7, 2021.

GUNDERSON, PALMER, NELSON
& ASHMORE, LLP

By _____
Jason M. Smiley
Ali J. Schaefbauer
Katelyn A. Cook
Attorneys for Plaintiff
P.O. Box 8045
Rapid City, SD  57709-8045
(605) 342-1078

7

EXHIBIT A
OPEN MORTGAGE, LLC
EXPENSE MANAGEMENT
BRANCH MANAGER COMPENSATION PLAN

This Compensation Plan is designed to document compensation methods for Forward and Reverse Loans, as applicable to you as an Employee based upon the loan types that you are specifically approved by the Company to originate.

Employee's compensation shall be determined and calculated in accordance with this Exhibit A (also, the "Plan"). Notwithstanding anything to the contrary herein, the timing of payments of compensation shall at all times be subject to company policies regarding payroll practices in effect. Company may, in its sole and absolute discretion, at any time and on a prospective basis, amend the compensation rates and formulas set forth in this Plan including but not limited to the manner and schedule of payment. No such change will retroactively affect any compensation Earned by Employee as of the date the change is announced.

Employee understands and acknowledges that Employee's duties establish Employee as a Non-Exempt employee and, unless otherwise notified by Company's Human Resources department of an Exempt status, is not exempt from any provisions requiring payment of any minimum wage or overtime premiums. Employee is required to maintain actual time worked in the Company's time-keeping system on a daily basis and will be paid an hourly wage as an advance against future commissions. Minimum wage payments (or Salary if Exempt) will be considered an advance against future Commissions. Branch Manager commission for W-2 payment, as described in more detail below, is the result of a formula which by definition is reduced by Branch Expenses, and in the case of open-end loans is also reduced by certain Loan Costs and Expenses. Any **overtime premium** will be paid by the Company and not as an advance.

Company expects that Employee's job responsibilities will require no more than 40 hours of time per week. Hours in excess of 40 hours in a week, must have prior written approval from the Director of Sales or his designee. This includes approved hours over the required 40, so that Company may be aware of hours worked and to ensure that Employee is paid timely.

This Compensation Plan does not constitute a contract for employment and either the Employee or the Company can terminate the employment relationship at any time, with or without notice, for any reason, or no reason at all.

I.    **Definitions.**

"Applicable Requirements" means Company policies and procedures, and all applicable federal, state and local laws, ordinances, rules, regulations, guidelines and other requirements pertaining to the mortgage banking industry[1], to the business of Company, and to the origination, processing, underwriting, closing, or funding of mortgages, or other activities of Company.

A "Basis Point" (also "BPS") is equal to one hundredth of one percentage point (0.01%) of the gross loan amount stated in the note at settlement. For Reverse Mortgage Loans, a "Basis Point" is equal to one hundredth of one

---

[1] The Equal Credit Opportunity Act, Gramm-Leach-Bliley Act, Truth in Lending Act, Real Estate Settlement Procedures Act, USA PATRIOT Act, Home Mortgage Disclosure Act, Federal Trade Commission Act, Telemarketing and Consumer Fraud and Abuse Prevention Act, Fair Credit Reporting Act, Fair Housing Act, Secure and Fair Enforcement for Mortgage Licensing Act of 2008 (the "SAFE Act"), Dodd-Frank Wall Street Reform and Consumer Protection Act and all related regulations to the foregoing Acts, and all similar federal, state and local laws, rules, regulations and requirements, federal and state telemarketing and do-not-call laws, rules and regulations, and all applicable guidelines and requirements of the Consumer Financial Protection Bureau ("CFPB"), United States Department of Housing and Urban Development ("HUD"), Department of Veterans Affairs ("VA"), Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac"), Federal National Mortgage Association ("FNMA" or "Fannie Mae"), Government National Mortgage Association ("GNMA" or "Ginnie Mae"), United States Department of Agriculture ("USDA") and all other applicable agencies, investors and insurers, in each case as amended from time to time.

Branch Name: Rapid City, SD                                              **Exhibit A, Page 1**

**Filed: 4/12/2021 11:58 AM CST   Pennington County, South Dakota    51CIV21-000445**

DocuSign Envelope ID: E221F602-B513-41FE-B767-9DE2AD99AC22

percentage point (0.01%) of the Unpaid Principal Balance.

"Branch Expenses" are amounts equivalent to the expenses incurred by Company in connection with the Branch, and include the following:

a.  Office Rent;
b.  Utilities;
c.  Office materials, supplies and services;
d.  Furniture, fixtures and equipment (limited to $500 per item);
e.  Advertising and marketing costs;
f.  Branch licensing and bonding fees;
g.  Dues and subscriptions;
h.  Branch Manager's commission for W-2 payment and payroll-related costs;
i.  Participating LO Commission and payroll-related costs;
j.  Employee or LO compensation of any type including hourly wage or a salary and payroll-related costs;
k.  Other "non-LO" W-2 compensation, payroll-related costs, and matching health insurance premiums;
l.  Benefits;
m.  Insurance;
n.  Employee and branch employee licensing, registration, and authorization fees and continuing education costs;
o.  Auto Mileage (if required by state law);
p.  Credit report fees for loans that are never closed;
q.  Other branch-related expenses that are not Loan Costs and Expenses

"Company" is Open Mortgage LLC.

"Compliant Amount" is an amount, further detailed below, that is calculated in a way that is in compliance with Applicable Requirements.

"Compliant Amount for Closed-end loans" (or, "for Reg Z loans") is calculated as the product of BPS for Compliant Amount for closed-end loans (Sec. II, Para. A.) multiplied by the Loan Amount or UPB, whichever is applicable, and is a term specifically used to denote the starting point for calculating a Branch Manager's commission for W-2 Payment.  However, the product for Forward transactions can not exceed the maximum dollar amount specified by the Plan.  This calculation is restated in an abbreviated format as follows:

> BPS for Compliant Amount for closed-end loans multiplied by the Loan Amount or UPB, whichever is applicable, subject to applicable maximum dollar amount.

"Compliant Amount for Open-end loans" (or, "for non-Reg Z loans") is calculated as the product of Company's regularly published premium, taking into account the specific combination of loan terms, multiplied by the UPB or Loan Amount, whichever is applicable.  To that product add Origination fees (subject to HUD cap), minus any Lender credit and/or cures; minus $1,695 on Reverse only.  This calculation is restated in tabular format as follows:

> Open Mortgage published premium multiplied by the UPB (or Loan Amount if applicable)
> plus:   Origination fees collected on the closing document
> minus:  Lender credit as shown on the closing document
> minus:  Lender cures
> minus:  $1,695 (applicable on Reverse only)
> = Compliant Amount

---

Branch Name:  Rapid City, SD

**Exhibit A, Page 2**

**Filed: 4/12/2021 11:58 AM CST  Pennington County, South Dakota    51CIV21-000445**

"Earned" means compensation on a particular mortgage loan is "earned" when it is closed and funded and is an Eligible Loan.

An "Eligible Loan" is defined as a residential mortgage loan (a) that is originated in accordance with Applicable Requirements; (b) that is closed and funded in accordance with Applicable Requirements, in the period in which the Commission is calculated; and (c) that is not unfunded, cancelled or rescinded for any reason within five (5) business days after settlement.

"Employee" is a Branch Manager for purposes of this Plan, and may be used interchangeably in this document.

"Loan Costs and Expenses" Amounts equivalent to the expenses incurred by Company in connection with an individual funded loan(s) which is open-end, and including, without limitation, the following:

a.    Appraisal fees not collected from a borrower
b.    waived Lending Fees or Origination Fees
c.    waived closing costs or fees
d.    pricing concessions
e.    subsequent loan losses, EPO, EPD
f.    lender credit
g.    other expenses related to a loan

"Participating Loan Originator (also "LO") Commission" refers to the LO's portion of the Compliant Amount and is established in Section II of the Company's *Loan Originator Commission Plan*.

"Registration date" is defined as the date a Forward loan reaches application status in LQB (the Company's loan origination system). The registration date for a reverse loan is typically 1 day before the closing date of a reverse loan.

"Reference Amount" This amount means the Compliant Amount minus the Participating Loan Originator (LO) Commission. The Reference amount is transferred into the branch that is managed by the Branch Manager.

"Reverse Mortgage Loan" means an Eligible Loan that is also a Home Equity Conversion Mortgage as defined in 24 C.F.R. § 206.3 and similar proprietary loans.

"The Rule" refers to a set of mortgage regulations issued by the Consumer Financial Protection Bureau (the "CFPB") in 2013 expanding upon earlier regulations implementing the new Dodd-Frank Act requirements, issued to restrict certain egregious compensation practices that were detrimental to consumers. These regulations are commonly referred to and abbreviated as "Reg Z." The Rule prohibits loan originators from receiving compensation based on terms or conditions of **closed-end** consumer credit transactions secured by a dwelling, and from steering consumers. Compensation based upon a fixed percentage of loan amount is specifically allowable and may be subject to a minimum or maximum dollar amount.

"Separate Agreement" is the Company's *Loan Originator Commission Plan*

 "Unpaid Principal Balance" means the unpaid principal due on a Reverse loan excluding interest or any other fees.

## II.    Branch Manager's commission for W-2 payment

The Expense Management Plan. The Company maintains an expense management Plan for its Branch Managers. The Company places a Branch Manager in charge of its branch (or branches) to manage the operations including but not limited to its Branch Expenses (and Loan Costs and Expenses in the case of non-Reg Z loans), the performance of branch employees, consumer relations, public relations and other matters necessary to maintain excellent Company service and image in the community and among consumers. In exchange for this management, the

---

Expense Management - Branch Manager Compensation  - Revised 2/3/2020                                                    Page 3 of 6

Branch Name: <u>Rapid City, SD</u>

**Exhibit A, Page 3**

DocuSign Envelope ID: E221F602-B513-41FE-B767-9DE2AD99AC22

Employee earns a Branch Manager's commission for W-2 payment which is based upon a running balance determined by the aggregate of the following calculations:

Branch Manager's commission for W-2 payment shall be calculated as follows for Closed-end loans:

Compliant Amount for Closed-end loans (see Definitions)
minus: Participating LO Commission (ref. Separate Agreement)
= Reference Amount transferred to branch
plus: Participating LO advances recovered
minus: Branch Expenses
= **Branch Manager's commission for W-2 payment**

Branch Manager's commission for W-2 payment shall be calculated as follows for Open-end loans:

Compliant Amount for Open-end loans (see Definitions)
minus: Participating LO commission (ref. Separate Agreement)
= Reference Amount transferred to branch
plus: Participating LO advances recovered
minus: Branch Expenses
minus: Loan Costs and Expenses
= **Branch Manager's commission for W-2 payment**

A.  BPS for Compliant Amount for Closed-end loans. The starting point for deriving Branch Manager's commission for W-2 payment, in the context of **closed-end** loans, begins with the calculation of Compliant Amount for a **closed-end** loan.  For an Eligible Loan for which Branch Manager originates or supervises the origination, Company will calculate the Compliant Amount as the product of the relevant Basis Points (also "BPS") effective on the Registration Date as set forth below, multiplied by the principal amount of credit extended on the loan. However, the product for Forward transactions can not exceed the relevant maximum dollar amount as set forth below.   For purposes of this Plan, the "amount of credit extended" for Reverse **closed-end** transactions is the Unpaid Principal Balance (UPB).

[box 1] 325____ Basis Points (not to exceed 325 BPS) of the principal amount of the credit extended for each Eligible Loan on Forward-Purchase transactions (and not including Bond or Chenoa Loans), provided, however, that in each case, the amount for any individual Eligible Loan should be equal to a maximum of no more than [box 2] $ N/A_____

[box 3] 325____ Basis Points (not to exceed 300 BPS) of the principal amount of the credit extended for each Eligible Loan on Forward-Refinance **and/or** Reverse closed-end transactions, provided, however, that in each case, the amount for any individual Eligible Loan should be equal to a maximum of no more than [box 4] $ N/A_____, and is applicable to Forward loans only.

150 Basis Points of the principal amount of the credit extended for each Eligible Loan on Bond and Chenoa Loans (as defined below).

B.  Bond and Chenoa Loans. "Bond Loans" refer to loans that are through programs designed to assist borrowers and  subsidize the cost of buying a home (i.e. Down Payment Assistance (DPA) loans, Federal Bond Programs, Chenoa, Housing Finance Agencies (HFA) loans) through a Master Servicer.

By company policy, the borrower must be charged the maximum combination of premium pricing, origination, and discount points for which the Program allows.

C.  Lending Fees and Origination Fees.

Branch Name: Rapid City, SD_____

**Exhibit A, Page 4**

**Filed: 4/12/2021 11:58 AM CST   Pennington County, South Dakota    51CIV21-000445**

DocuSign Envelope ID: E221F602-B513-41FE-B767-9DE2AD99AC22

Lending Fees for Forward loans will be charged to the borrower for the benefit of the Company as follows:

a.   Administrative Fee: $ N/A
b.   Underwriting Fee: $ 870
c.   Processing Fee: $ 495

Origination fees for closed-end Reverse Loans must be charged to the borrower for the benefit of the Company in an amount equal to the maximum allowable HUD origination fee.

Origination fees for open-end Loans may be charged at the Employee and borrower's option; but in the case of a Reverse loan the borrower may only be charged up to the maximum allowable HUD origination fee; for the benefit of Employee.

D.   **Advanced Amounts**. Employee is only considered to have earned and be entitled to payment of a Commission on Eligible Loans. If an originated loan that has closed and been funded subsequently is found to not meet the definition of an Eligible Loan, the loan is not an Eligible Loan under this Plan, and Employee is not entitled to a Commission on such loan. Notwithstanding the foregoing, Company may advance Commission Amounts for all Eligible Loans that meet the Eligible Loan definition, as applicable, in the next payment cycle. If the Commission has been advanced on a loan that later is found to not meet the definition (e.g., it is later discovered that the loan was not originated in accordance with Applicable Requirements), Employee shall owe Company the amount advanced to Employee on such ineligible loan. In such case, subject to applicable law, (a) if Employee is still employed by Company, Company will reduce the amount of any such unearned advancement from the next commission payment to Employee; or (b) if Employee is no longer employed by Company, Employee shall reimburse Company the amount of any such unearned advancement in cash or by check within 30 days of Company's notification to Employee of the amount due. Employee understands and agrees that, should Employee not reimburse Company any amounts Employee owes, Company may bring an action to recover such amounts. Notwithstanding the foregoing paragraph, in no case will Employee receive less than the applicable state and federal minimum amount for any hours worked in each workweek during the employment period.

**III.    Periodic Reviews.**

Periodically, Company will evaluate the compensation paid to its employees based on factors such as loan performance, transaction volume, and current market conditions, and prospectively revise the compensation it agrees to pay to Employee. Company shall have the right, at its discretion, to modify this compensation Plan, in whole or in part, at any time on a prospective basis. No retroactive changes will be considered. Additionally, all commission will be calculated in accordance with this Plan, and in no instance will the commission be calculated in a way prohibited by the Rule. In the event of a recalculation, Company shall issue and deliver to Employee a new Plan which reflects such changes which shall, as of the effective date stated thereon, supersede and replace the prior Plan. Upon modification of this Plan, the calculations herein will apply to all transactions with a locked date (registered date, if applicable) that is prior to the effective date of such modification. Branch Manager will be responsible for conveying the changes to any individual loan originator(s) in his or her branch. The Company may in its sole and absolute discretion add certain amendments to this Plan.

---

Branch Name:  Rapid City, SD

**Filed: 4/12/2021 11:58 AM CST   Pennington County, South Dakota   51CIV21-000445**

DocuSign Envelope ID: E221F602-B513-41FE-B767-9DE2AD99AC22

Employee and Company hereby agree to Employee's compensation as set forth in this Plan, which shall be effective for all transactions with a locked date (registered date, if applicable) after ___5/19/2020___.

**EMPLOYEE**
**Branch Manager:**

By: _____

Print Name: Russ Allgier

Date: 5/19/2020

**OPEN MORTGAGE, LLC**

By: Logan Manning _____

Its: Sales Specialist

Date: 5/19/2020

## NON-COMPETITION, NON-SOLICITATION AND
## CONFIDENTIALITY AGREEMENT

This Non-Competition, Non-Solicitation and Confidentiality Agreement (the "Agreement") is made and entered into as of this _28_ day of _March_ , 2019, by and between Open Mortgage LLC, a duly organized Texas limited liability corporation (hereinafter referred to as the "Company" or "Employer") and                    , an individual residing at                         . (hereinafter referred to as the "Employee").[1]

WHEREAS, the Company is in the mortgage business (the Company's "Business");

WHEREAS, Employee was hired by the Company on or about _____ , 2019 currently serving as _____ to render services related to the Services of the Company;

WHEREAS, Employee agrees that, due to the nature of Employee's position, if Employee engages in any activities which are directly or indirectly competitive with the Company, such activities would cause the Company great and irreparable harm. Employee also agrees that Employee's work for the Company will bring Employee into close contact with the Company's business relationships, vendors and customers and the goodwill associated with them, and expose Employee to the Company's trade secrets and Confidential Information. Employee further agrees that the covenants contained herein are reasonable and necessary to protect the Company's legitimate business interests in its customer and business relationships and goodwill, as well as its trade secrets and Confidential Information. Therefore, Employee agrees that: (i) it is necessary for the Company to protect its business from such damage; (ii) that the following covenants constitute a reasonable and appropriate means, consistent with the best interests of both Employee and the Company, to protect the Company against such damage; (iii) that the covenants herein are supported by separate and adequate consideration from the Company; and (iv) shall apply to and be binding upon Employee as provided herein.

WHEREAS, Employee desires to initiate or continue employment with the Company, to receive portions of the Company's trade secrets and Confidential Information, and access to the Company's customer and business relationships and goodwill, and to receive all of the other benefits pertinent to employment upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter

---

[1] Important state-specific modifications to this Agreement are contained in Appendix A hereto.

**Exhibit B, Page 1**

contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and the Employee hereby covenant and agree as follows:

**1. Duty of Loyalty.** Employee understands that Employee owes a duty of loyalty to the Company during his/her employment. As part of that duty, Employee promises:

1.1 Best Efforts. Employee will apply Employee's best efforts to his/her work, and will not do anything that could harm the Company, its employees, customers, or products.

1.2 Business Opportunities. Employee will promptly tell the Company about any opportunity that relates to the Company's business. Employee will not use such business opportunities for Employee's own gain or for that of anyone else. Employee agrees that all opportunities Employee becomes aware of during the course of Employee's employment relating to the business of the Company are owned by the Company.

1.3 Position of Trust and Confidence. Employee acknowledges and agrees that Employee is not subject to any contract or other legal obligation that would prohibit Employee's employment with Employer or the performance of Employee's duties for it. During employment, Employee will avoid conduct that would otherwise violate Section 5 if it occurred after employment unless it is authorized as part of Employee's employment duties. In reliance upon the covenants made by Employee in this Agreement, the Company will provide Employee with access to portions of the Confidential Information (including trade secrets) related to Employee's position, and may also provide Employee specialized training related to the Company's Business and/or the opportunity to develop relationships and goodwill with the Company's employees and business contacts (customers and others) for the Company's benefit. Employee agrees that the foregoing would give Employee an unfair competitive advantage if Employee's activities during employment, and for a reasonable period thereafter, were not restricted as provided for in this Agreement.

1.4 Company Property. Employee understands that access to and use of Company's computer systems to compete or prepare to compete against the Company is unauthorized access that is strictly prohibited. All records, in any form (such as but not limited to, email, correspondence, notes, files, contact lists, drawings, specifications, spreadsheets, manuals, and calendars) that contain Confidential Information or otherwise relate to the Company's Business that are created, acquired, or made available to Employee in the course of Employee's employment, with the exception of the compensation and benefit materials provided to Employee and pertaining to Employee as an employee, are the property of the Company (collectively "Company Records"). Employee will follow all Company policies regarding use and storage of Company Records. Employee will take any steps necessary to permit Company to inspect and confirm that all Confidential Information has been removed from all storage

devices and accounts Employee owns or controls.

1.5 <u>Kickbacks</u>. Employee will not solicit, receive, promise or provide any bribe or kickback related to any Company activities and will not solicit, receive, promise or provide any remuneration not authorized by the Company. In addition, Employee will not knowingly and willfully solicit or receive any remuneration (including any kickback, bribe or rebate) or offer to pay any such remuneration, directly or indirectly, overtly or covertly, in cash or in kind a) in return for receiving a government contract of any kind for either the benefit of the Employee, the Company, a client, or a third party who is the source of referrals of business ("Referral Source"); b) in return for securing a government benefit of any kind for either the Employee, the Company, a client or a Referral Source; c) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by any the government programs; or d) in return for purchasing, ordering or arranging for or recommending the purchasing or ordering of any good, service, or item for which payment may be made in whole or in part by any government programs.

**2. Confidential Information.**

2.1 Employee hereby acknowledges the following:

(a) <u>The Company Possesses Confidential Information</u>. That the Company possesses certain confidential and proprietary information. As used herein, the term "Confidential Information" shall mean any and all information, not readily available to the public, regardless of whether kept in a document, electronic storage medium, or in the Employee's memory, and includes, but is not limited to, all data, compilations, programs, devices, strategies, concepts, ideas or methods concerning, evidencing, or related to:

      (i) the Company's financial condition, results of operations, and amounts of compensation paid to officers and employees;

      (ii) marketing and sales programs of the Company and the terms and conditions of sales and offers of sales of products and/or services by the Company;

      (iii) the terms, conditions and current status of the Company's agreements and relationships with any financial institutions, customers, vendors, suppliers, or other entities;

      (iv) the identities and business preferences of the Company's actual and prospective business relationships with financial institutions, vendors, suppliers and/or customers, including any employee thereof with whom the Company communicates along with the Company's practices and procedures for identifying prospective customers;

      (v) the names and identities of any and all of Company's

**Exhibit B, Page 3**

customers, including any and all customer lists or similar compilations;

(vi) the know-how, processes and techniques, regulatory approval strategies, computer programs, data, formulae, and compositions, service techniques and protocols, new product designs and other skills, ideas, and strategic plans possessed, developed, accumulated or acquired by the Company;

(vii) personnel information regarding the productivity and profitability (or lack thereof) of Company's employees, agents, or independent contractors;

(viii) any communications between the Company, its officers, directors, shareholders or employees, and any attorney retained by the Company for any purpose, or any person retained or employed by such attorney for the purpose of assisting such attorney in his or her representation of the Company;

(ix) the cost or overhead associated with the services provided by the Company along with the Company's pricing structure for its services, including its margins, discounts, volume purchases, or incentives; and

(x) any other matter or thing, whether or not recorded on any medium or kept in the Employee's memory by which the Company derives actual or potential economic value from such matter or thing being not generally known to other persons or entities who might obtain economic value from its disclosure or use, or which gives the Company an opportunity to obtain an advantage over its competitors who do not know or use the same.

(b) Confidential Information Is Valuable. That maintaining the confidential and proprietary nature of the Confidential Information is essential to the commercial success of the Company's business and that the Confidential Information constitutes valuable and unique assets which will provide the Company with a distinct competitive advantage over competing businesses; and

(c) Employee Will Have Access To Confidential Information. The Company promises to provide Employee with some of the Company's Confidential Information to aid Employee in the performance of Employee's duties. Without Employee's agreement to the restrictions and protections contained herein, Employee would not be entrusted with these items and benefits of association with the Company. The Company would not grant Employee such access to Confidential Information but for Employee's full compliance with, and the enforceability of, the protective covenants provided for in the Agreement. To the extent Employee has already received some of the Company's Confidential Information, Employee assigns to the Company all interest in, and rights to the use of, Confidential Information and customer good will that Employee may have received or developed in the course of employment with the Company in the past and waives and releases any claim that he or she should be allowed to use Confidential

Information for any purpose or in any manner not authorized by this Agreement.

(d) <u>Confidential Information Includes Protected Health Information</u>.

Confidential Information Includes Protected Health Information ("PHI"). PHI means the identities of Company customers and information related to an individual's past, present or future physical or mental health condition, prescription medications, medical or pharmaceutical treatment, or payment for the medications or treatment that identifies the individual or from which the individual could be identified.

**3. Employee Promises With Respect To Confidential Information.** The Employee promises as follows:

3.1 <u>Promise to Protect</u>. Employee will protect the Company's Confidential Information, keep it secret, and maintain it in the strictest confidence. Employee will use it only for the Company's benefit and only with the Company's permission. Employee will not tell or give Confidential Information to anyone outside the Company, or use it for any other purpose, without first receiving the Company's permission. Employee will immediately notify the Company in writing if he/she learns of any unauthorized use, copying or disclosure of Confidential Information or if at any time he/she believes that Confidential Information is being misappropriated, lost or disclosed.

3.2 <u>Return of Information</u>. When Employee's employment ends, for whatever reason, or at any other time the Company requests, Employee will promptly return all papers, electronic information and other data or property that belong to the Company, including but not limited to any property that contains any Confidential Information and all Company Records.

3.3 <u>Company Ownership</u>. Employee acknowledges and agrees that the Confidential Information belongs to the Company. Employee's promise to protect the Confidential Information and keep it secret lasts both during Employee's employment and after he/she leaves the Company. If an additional time limitation on this restriction is required in order for it to be enforceable, then this restriction shall be limited to a period of two (2) years following the termination of Employee's employment for any information that does not qualify as a trade secret. Trade secret information will remain protected at all times and nothing herein shall be construed to reduce or diminish the applicability of trade secret protections, statutory or common law, that apply to the Company's trade secrets independent from this Agreement.

3.4 <u>Carve-Out for Non-Management Employees</u>. Confidential Information does not include information lawfully acquired by a non-management employee (laborer) about wages, hours or other terms and conditions of employment when used for purposes protected by §7 of the National Labor Relations Act such as joining or forming a union, engaging in collective bargaining, or engaging in other concerted activity for mutual aid or protection of laborers. For purpose of clarity, it shall still be a violation of this

**Exhibit B, Page 5**

Agreement for a non-management employee (laborer) to wrongfully compete by sharing Confidential Information with a competitor about other employees' compensation and benefits which was obtained through the course of employment with the Company for purposes of assisting such competitor in soliciting Company employees.

3.5 <u>Protection of Others' Rights</u>. Employee acknowledges that it is against Company policy to infringe upon or misappropriate the rights or property of others. Employee agrees and warrants that all intellectual property developed by Employee for the Company, or otherwise provided by Employee to the Company, will not infringe in any respect on rights or properties belonging to Employee or to any third party. Employee will not use in Employee's work for the Company, nor will Employee bring on to the Company's premises, confidential information, inventions, or other intellectual property that belong to any of his/her former employers. Employee further confirms that Employee's employment with the Company will not violate any agreements with former employers or otherwise violate any obligations he/she owes to former employers.

3.6 <u>Protected Conduct</u>. Nothing in this Agreement prohibits Employee from reporting an event that Employee reasonably and in good faith believes is a violation of law to the relevant law-enforcement agency (such as the Securities and Exchange Commission, Equal Employment Opportunity Commission, or Department of Labor), or from cooperating in an investigation conducted by such a government agency.   Employee is hereby provided notice that under the 2016 Defend Trade Secrets Act (DTSA): (1) no individual (consultant, contractor or employee)  will be held criminally or civilly liable under Federal or State trade secret law for the disclosure of a trade secret (as defined in the Economic Espionage Act) that: (A) is made **in confidence to** a Federal, State, or local government official, either directly or indirectly, or to an attorney; and made **solely for the purpose of** reporting or investigating a suspected violation of law; or, (B) is made in a complaint or other document filed in a lawsuit or other proceeding, **if such filing is made under seal** so that it is not made public; and, (2) an individual who pursues a lawsuit for retaliation by an employer for reporting a suspected violation of the law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except as permitted by court order.

**4. Developments.**

4.1 <u>Development of Information</u>. During the term of Employee's employment with the Company, Employee shall keep the Company informed of any and all promotional and advertising materials, catalogs, brochures, plans, lists of Referral Sources, client lists, supplier lists, manuals, handbooks, inventions, discoveries, improvements, trade secrets, secret processes and any technology, know-how or intellectual property made or developed by Employee in whole or in part, or conceived of by Employee, alone or

**Exhibit B, Page 6**

with others, (i) which results from any work Employee may do for, or at the request of Company, or (ii) which relates in any way to the business operations, activities, research, investigations or obligations of the Company or (iii) which results from any activities of Employee using the Company's facilities or using the Company's resources (collectively the "Information").

4.2 <u>Assignment of Information to Company</u>. Employee and Employee's heirs, assigns and representatives shall assign, transfer and set over, and do hereby assign, transfer and set over, to the Company, and its successors and assigns, all of Employee's and their right, title and interest in and to any and all Information, and any patents, patent applications, copyright, trademarks, trade names or other intellectual property rights relating to the Information. For purposes of this Section 4.2, any Information developed, conceived or provided by the Employee within six (6) months after the date of the termination of Employee's employment with the Company shall be presumed to have been developed, conceived or provided during the Employee's term of employment with the Company. Notwithstanding the foregoing, this Section does not apply to an invention for which no equipment, supplies, facility, or Confidential Information of the Company was used and which was developed entirely on Employee's own time, unless (a) the invention relates (i) to the business of the Company, or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by Employee for the Company.

4.3 <u>Continued Cooperation of Employee</u>. To the extent the Company deems necessary and desirable to effect the intent of the assignments, transfers and set-overs provided above, Employee and Employee's heirs, assigns and representatives, shall, at the expense of the Company, assist the Company or its nominees to obtain patents, copyrights, trademarks and trade names or similar rights of protection (including any renewals or continuations thereof) for any and all of the Information in any country or countries throughout the world. During and after Employee's employment with the Company, Employee and Employee's heirs, assigns and representatives, shall execute and deliver any and all applications, assignments or other instruments necessary or desirable to secure a United States or foreign patent, copyright, trademark and trade name or similar right of protection (including any renewals or continuations thereof), and to transfer to the Company, upon request, any and all right, title or interest in and to any and all such patents, copyrights, trademarks, trade names and all other Information. Employee and Employee's heirs, assigns and representatives shall give the Company, upon request, any and all facts known to Employee or them reflecting such Information with respect to any of the foregoing, including, without limitation, any and all formulae, processes, sketches, drawings, models and figures.

4.4 <u>Notice</u>.  Employees in **California, Washington, Utah, Minnesota, Delaware, Illinois, Kansas,** and **North Carolina** are advised to refer to Exhibit B for additional information about the scope of the invention assignment provisions in this Section 4.

**Exhibit B, Page 7**

**5. Covenant Not to Compete; Covenants Not to Solicit.**

5.1 The Employee hereby acknowledges and understands that the Company invests significant resources in the training and development of its employees and that he/she has been provided Confidential Information and access to clients, Referral Sources, and goodwill. In light of this understanding, Employee agrees to the following obligations that are reasonably designed to protect the Company's legitimate business interests without unreasonably restricting Employee's ability to seek or obtain employment after employment with the Company terminates for any reason:

(a) Goodwill. That Employee is being employed by the Company in a position in which Employee will be expected to independently develop and maintain close relationships with Referral Sources and clients of the Company and that such relationships with Referral Sources and clients constitute a significant part of the goodwill of the Company, the preservation of which is essential to the success of the Company, and that the Company has a legitimate business interest in reasonably restricting Employee's ability to take advantage of such relationships for the benefit or intended benefit of any third party; and

(b) The Company's Interest In Protecting Goodwill And Company Information.

That, (i) as the result of the inherently close association between Employee and the Company's Referral Sources, suppliers and clients with reference to the products sold and services provided by the Company, and (ii) as the result of the knowledge Employee will obtain of the Company's methods for the development of Referral Sources and clients as well as other Confidential Information as described herein, competition by the Employee against the Company will cause the Company to suffer irreparable harm and seriously damage its goodwill, risk the misuse of the Company's Confidential Information and undermine the success of its business.

**5.2 Non-Competition and Non-Solicitation Restrictions.**

In light of the foregoing, Employee hereby covenants and agrees, that, during the term of the Employee's employment with the Company and for a period of one (1) year immediately following the termination of Employee's employment with the Company, whether voluntary or involuntary, and regardless of the reason for or manner of termination, Employee shall not, alone or with others, directly or indirectly (as owner, stockholder, partner, lender, other investor, director, officer, employee, consultant or in any other capacity of any nature whatsoever):

(a) anywhere within the Territory (defined below) or for the benefit of a Competing Business's (defined below) operations or sales within the Territory, directly or indirectly, acting individually or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of the Employer): (i) provide services that are the same

as or similar in function or purpose to the services Employee provided to the Employer during the last two (2) years of employment or such shorter period of time as Employee has been employed (the "Look Back Period") or such other services that are otherwise likely or probable to result in the use or disclosure of Confidential Information to a business whose products and services include products and services offered by the Employer regarding which Employee had material involvement or received Confidential Information about during the Look Back Period (such products and services being "Competing Products and Services" and such business being a "Competing Business"). The Parties agree that at the time of signing, the Employer's products and services include the Business (as previously defined) ; and/or (ii) own, receive or purchase a financial interest in, make a loan to, or make a monetary gift in support of, any such Competing Business; provided, however, that Employee may own, directly or indirectly, solely as an investment, securities of any business traded on any national securities exchange or NASDAQ, provided that Employee is not a controlling person of, or a member of a group that controls, such business, and further provided that Employee does not, in the aggregate, directly or indirectly, own Two Percent (2%) or more of any class of securities of such business. Provided further that nothing herein shall be construed to prohibit Employee's employment in a separately operated subsidiary or other business unit of a company that would not be a Competing Business but for common ownership with a Competing Business so long as written assurances regarding the non-competitive nature of Employee's position that are satisfactory to the Employer have been provided by Employee and the new employer in advance. "Territory" shall have the following meaning(s): (i) If Employee is in a senior management position (such as Vice President and above, Director, or Officer) then Territory means the United States and each additional country (including state and state-equivalents and county and county-equivalents within those countries) in which the Company is doing business as of Employee's termination date; (ii) if Employee is in a position where Employee's responsibilities are not geographically limited to an assigned location or territory or where Employee is provided Confidential Information that is not geographically limited to an assigned location or territory (such as, by way of example but not limitation, management positions), then Territory means the United States and each additional country (including state and state-equivalents and county and county-equivalents within those countries) in which the Company is doing business as of Employee's termination date; (iii) if Employee is in a position with responsibilities and Confidential Information that are limited to an assigned territory or territories during the Look Back Period, then Territory shall be the specific geographic territory or territories assigned to Employee during the Look Back Period; and (iv) if neither (i), (ii) or (iii) apply, then the Territory is the county or counties that the Employee performed services in or on behalf of the Employer during the Look Back Period.

(b) knowingly participate in soliciting or communicating with a Covered Employee on

behalf of a Competing Business for the purpose of persuading the Covered Employee to end or modify the Covered Employee's employment relationship with the Employer. During employment with Employer, Employee agrees Employee will not solicit or communicate with a Covered Employee of the Employer for the purpose of persuading such Covered Employee to work for a Competing Business. In the event Employer loses a Covered Employee due, in whole or in part, to conduct by Employee that violates this Agreement prior to the issuance of injunctive relief, Employee shall pay Employer a sum equal to thirty percent (30%) of the annual wages of the person(s) who were improperly solicited and left Employer, based on such person's last rate of pay with Employer. This payment shall not preclude or act as a substitute for any remedy that would otherwise be available, including but not limited to, injunctive relief to prevent further violations. As used in this paragraph, an employee is a "Covered Employee" if the employee is employed by the Company and is someone with whom Employee worked, as to whom Employee had supervisory responsibilities, or regarding which Employee received Confidential Information during the Look Back Period. For purposes of this Agreement, **"solicit"** and related terms such as "soliciting" or engaging in "solicitation" mean to engage in contacts, acts, or communications, whether directly engaged in by Employee in person or indirectly engaged in through the use or control of others, that cause or induce, attempt to cause or induce, or can be reasonably expected to cause or induce a party to engage in a particular action or conduct, regardless of who first initiates the contact or communication, or whether or not the communication at issue is in response to a request for information or not. Nothing herein is intended or to be construed as a prohibition against general advertising such as "help wanted" ads that are not targeted at Employer's employees.

(c) on behalf of a Competing Business solicit, divert or take away, or attempt to solicit, divert or take away business from a Referral Source or potential Referral Source or otherwise offer services in competition with Open Mortgage, (i) with whom Employee had contact while employed by the Company or (ii) about whom Employee obtained Confidential Information while employed by the Company (hereinafter a "Prohibited Referral Source").

(d) on behalf of a Competing Business: (i) solicit, assist in soliciting, facilitate the solicitation of, provide, or offer to provide services to any and all customers of the Employer as to which Employee had contact, provided services or received Confidential Information about in the Look Back Period ("Covered Customer") for the purpose of providing a Competing Product or Service; or (ii) induce or attempt to induce any Covered Customer to withdraw, curtail or cancel its business with the Employer or in any other manner modify or fail to enter into any actual or potential business relationship with the Employer.

(e) on behalf of a Competing Business: (i) solicit, assist in soliciting, or facilitate the solicitation of any and all vendors of the Employer as to which Employee had contact or

received Confidential Information about during the Look Back Period ("Covered Vendor") on behalf of a Competing Business; or (ii) induce or attempt to induce any Covered Vendor to withdraw, curtail, cancel, or otherwise detrimentally modify its business relationship with the Employer.

5.3 Limited Waiver. If Employee believes that employment with a Competing Business will not injure or infringe on the Company's legitimate interests, Employee agrees to notify the Company and engage in a dialogue and exchange of information regarding the contemplated employment so that the Company can determine whether, in its exercise of sole discretion, a limited carve-out from the non-compete should be allowed.

## 6. Enforcement.

6.1 Employee acknowledges and agrees that the foregoing limitations set forth in Section 5 of this Agreement are reasonable as written and properly required for the adequate protection of the Company's business and do not preclude the Employee from pursuing his or her livelihood. The covenants and obligations of the Employee pursuant to this Agreement shall be specifically enforceable in addition to and not in limitation of any other legal or equitable remedies, including money damages, which the Company may have. Employee recognizes and acknowledges that damages and irreparable injury will result to the Company in its business in the event of any breach by Employee of any covenant or agreement contained herein and, for this reason, Employee consents and agrees that in the event of any such breach or threatened breach, the Company shall be entitled, in addition to any other remedies that it may have, to an injunction to restrain Employee from committing or continuing any violation of any covenant or agreement set forth in this Agreement. One Thousand Dollars ($1000) is the agreed amount for the bond to be posted (if any) if an injunction is sought by the Company to enforce the restrictions in this Agreement on Employee. It is the intent of the parties that this Agreement contains covenants which are valid and enforceable, which are reasonable and necessary to safeguard the interests of the Company and which will be binding upon the Employee. Therefore, in the event that any of the restrictions are determined to be unreasonable or unenforceable due to an overbroad element (like time, geography, or scope of activity), the court shall enforce the restriction to such lesser extent as would be reasonable and enforceable and/or reform any overbroad element so as to make it enforceable. In the event that Employee violates any of the covenants contained in this Agreement and the Company is required to seek enforcement of such in any court having jurisdiction, Employee shall be responsible for all reasonable attorneys' fees and costs incurred by the Company in the successful enforcement of this Agreement, in addition to any damages sustained by the Company as the result of the violations.

6.2 If Employee violates any provisions of this Agreement, then any of the time

limitations set forth in this Agreement shall be extended for a period of time equal to the period of time during which such breach occurs but no longer than the time limitations herein; and in the event that the Company is required to seek relief from such breach before any court, board or other tribunal, then the time limitations shall be extended for a period of time equal to the pendency of such proceedings, including all appeals, but no longer than the time limitations herein.

## 7. Assignment.

7.1 This Agreement is personal as to the Employee and shall not be assignable by the Employee. Employee agrees that the Company may assign its rights under this Agreement to any person, firm or corporation, including any affiliate or subsidiary of the Company and successors. For purposes of this Agreement, the term "Company" shall include, without limitation, the Company and any parent, subsidiary or affiliate of the Company and any successors and assigns of the Company or successors and assigns of any parent, subsidiary or affiliate of the Company to or for whom Employee provides services or is employed. The term "affiliate" shall include any corporation, firm or other entity which controls, is controlled by or is under common control with the Company. Specifically, without limitation, the obligations of Employee with respect to Confidential Information as set forth herein shall apply to any and all Confidential Information of any parent, subsidiary or affiliate of the Company that Employee learns or has access to by virtue of Employee's employment. This Agreement will bind and inure to the benefit of the heirs, successors and assigns of the Company, including any continuing entity resulting from a sale, merger, consolidation or other transaction, and may be assigned or enforced by any of them without the need for further action or consent by Employee.

## 8. Employment At Will.

The Employee understands and agrees that this Agreement does not guarantee his/her continued employment or affiliation with the Company and that his/her employment with the Company is on an "at-will" basis. Accordingly, the Employee understands and agrees that either the Company or the Employee may terminate the employment relationship at any time, for any or no reason, with or without prior notice. Employee further understands and agrees that the nature of the termination (voluntary or involuntary, with or without cause, etc.,) in no way impacts or alters Employee's obligations hereunder.

## 9. Changes In Employment Status.

The obligations and restrictions contained in this Agreement shall continue to apply to Employee regardless of whether the Employee is promoted, demoted, transferred or if his/her job assignment changes in any way during the course of his/her employment with the Company. The obligations and restrictions contained in this Agreement survive and continue to apply to the Employee after his/her employment terminates for any reason.

**Exhibit B, Page 12**

**10. Independent Agreement.**

Employee understands and agrees that the consideration for this Agreement consists exclusively of i) the Company's agreement to employ or continue to employ the Employee on an at-will basis; ii) any specialized training provided to the Employee; iii) the confidential information and and/or trade secrets disclosed to the Employee by the Company; iv) increased Employee job responsibilities; v) additional Employee compensation, such as a bonus; and/or vi) the Employee's ability to exploit the Company's goodwill and reputation with existing and potential customers and suppliers in the geographic markets the Company serves. Accordingly, Employee understands and agrees that all the terms and obligations contained in this Agreement are independent of the existence of any claim or cause of action by Employee against the Company, whether predicated on claims for wages, commissions or other benefits, or upon other terms and conditions of employment, and any such claims shall not constitute a defense to Employee's obligations hereunder, or to the enforcement by the Company of this Agreement, but shall be determined separately and independently.

**11. Miscellaneous.** The titles or headings of the paragraphs of this Agreement are not a part of this Agreement and shall have no effect upon the construction or interpretation of any part thereof. This Agreement shall be interpreted under and construed in accordance with the laws of the State of Texas, without regard to conflict of laws principles. Any action or proceeding brought by either party against the other arising out of or related to this Agreement may be brought in a state court of competent jurisdiction located in the State of Texas or the Federal District Court for the Western District of Texas, which shall have non-exclusive jurisdiction over any such action or proceeding. The parties hereby consent to the personal jurisdiction of these Texas courts. If any provision or portion of this Agreement shall to any extent be held invalid or unenforceable in any circumstances, the remainder of this Agreement and the application of such portion or provision of this Agreement to other circumstances shall be valid and enforceable to the fullest extent permitted by law. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any other agreements or understandings, whether verbal or written. The Employee agrees and acknowledges that no agreement, representation, warranty or covenant has been made by either party except as expressly set forth herein. This Agreement shall not be altered, modified, amended or terminated except by a written instrument executed by Employee and the President/CEO of the Company or by order of a court of competent jurisdiction. No waiver, express or implied, shall constitute a waiver of any other breach of the same or any other covenant, agreement or duty. No delay or omission by the Company in exercising any right under this Agreement shall operate as a waiver of that or any other right.

**12.** Employee will advise any future employer of the restrictions in this Agreement before accepting new employment.  Employee understands that the Company may

provide another party notice of this Agreement and an opinion about its applicability. While Employee may disagree with such an opinion, Employee recognizes the Company's legitimate business interest in expressing its opinion and consents to it doing so. Employee will not assert any claim that such conduct is legally actionable interference or otherwise impermissible regardless of whether or not this Agreement is later found to be enforceable in whole or in part.

**13. EMPLOYEE AND THE COMPANY KNOWINGLY AND WILLINGLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

**14. THE PARTIES REPRESENT THAT THEY HAVE READ, UNDERSTOOD AND AGREED TO THE PROVISIONS CONTAINED IN THIS AGREEMENT. THE PARTIES HAVE FURTHER AGREED THAT THE NON-COMPETITION AND NON-SOLICITATION RESTRICTIONS CONTAINED IN THIS AGREEMENT ARE REASONABLE IN NATURE AND NECESSARY TO PROTECT THE COMPANY'S LEGITIMATE BUSINESS INTERESTS.**

COMPANY:

OPEN MORTGAGE, LLC

By:  _____

Date:  _____04/02/19_____

Name:  Scott Gordon

Title:  President

EMPLOYEE:

By:  _____

Date:  3-28-2019

Name:  Russell Allager

Title:

## EXHIBIT A

### STATE-SPECIFIC MODIFICATIONS

A.    **Arizona.** For an Arizona resident, for so long as the Employee resides in Arizona and is subject to the laws of Arizona: the restrictions in Paragraph 5.2 (c), (d) and (e) will only apply within the Territory.

B.    **California and North Dakota.** For a resident of California or North Dakota, for so long as the Employee resides in and is subject to the laws of such state: (1) no provision or requirement of the Agreement will be construed or interpreted in a manner contrary to the public policy of the States of California or North Dakota; (2) the noncompetition restriction in Paragraph 5.2(a) shall not apply (although the definitions shall remain intact for purposes of the remaining provisions in this Agreement); and (c) Paragraphs 5.2(c), (d) and (e) shall be limited to situations where Employee is aided in his or her conduct by the use or disclosure of Employer's trade secrets (as defined by California or North Dakota law, as applicable). In California, the venue and choice of law provisions in Paragraph 11 and the jury trial waiver in Paragraph 13 shall not apply.

C.    **Georgia.** For a Georgia resident, for so long as the Employee resides in Georgia and is subject to the laws of Georgia, the tolling language in Paragraph 6.2 and the jury trial waiver in Paragraph 13 shall not apply.

D.    **Illinois.** For an Illinois resident, for so long as the Employee resides in Illinois and is subject to the laws of Illinois, in addition to initial employment or continued employment and the mutual obligations of the parties in this Agreement, this Agreement is supported by extra consideration in the form of _____ *[e.g., a signing bonus of $1000.00]*.

E.    **Louisiana.** For a Louisiana resident, for so long as the Employee resides in Louisiana and is subject to the laws of Louisiana: the enforcement of the restrictions in Paragraph 5.2(a), (c), (d), and (e) will be limited within the state of Louisiana to the Parishes in which the Employee assisted Company in providing its products and services, as are indicated below by circling; provided, however, that nothing in this Agreement may be construed to prohibit the enforcement of Paragraph 5.2 in accordance with its terms in states outside of Louisiana.

**[COMPANY:    CIRCLE    THOSE    THAT    APPLY.    Note    that    if    Employee    has geographical responsibilities outside of Louisiana, then any counties outside of Louisiana that are to be included within the restricted area need to be identified by name as well.]**

**Exhibit B, Page 16**

| | | | |
|---|---|---|---|
| Acadia | Allen | Ascension | Assumption |
| Avoyelles | Beauregard | Bienville | Bossier |
| Caddo | Calcasieu | Caldwell | Cameron |
| Catahoula | Claiborne | Concordia | De Soto |
| East Baton Rouge | East Carroll | East Feliciana | Evangeline |
| Franklin | Grant | Iberia | Iberville |
| Jackson | Jefferson | Jefferson Davis | Lafayette |
| Lafourche | La Salle | Lincoln | Livingston |
| Madison | Morehouse | Natchitoches | Orleans |
| Ouachita | Plaquemines | Pointe Coupee | Rapides |
| Red River | Richland | Sabine | St. Bernard |
| St. Charles | St. Helena | St. James | St. Mary |
| St. John the Baptist | St. Landry | St. Martin | St. Tammany |
| Tangipahoa | Tensas | Terrebonne | Union |
| Vermilion | Vernon | Washington | Webster |
| West Baton Rouge | West Carroll | West Feliciana | Winn |

F.     **Montana**.  For a Montana resident, for so long as the Employee resides in Montana and is subject to the laws of Montana:  except for the probationary period or otherwise allowed by law, the last sentence of Paragraph 8 shall not apply.

G.     **Nebraska.**  For a Nebraska resident, for so long as the Employee resides in Nebraska and is subject to the laws of Nebraska: (a) the definition of "Prohibited Referral Source" in Paragraph 5.2(c) is modified so that it means Referral Sources with which Employee did business and had personal business-related contact;  (b) the definition of "Covered Customer" in Paragraph 5.2(d) is modified so that it means any persons or entities with which Employee did business and had personal business-related contact during the Look Back Period; (c) the definition of "Covered Vendor" in Paragraph 5.2(e) is modified so that it means vendors and contractors with which Employee had personal business-related contact during the Look Back Period;  and (d) the noncompetition restriction in Paragraph 5.2(a) does not apply (although the definitions shall remain intact for purposes of the remaining provisions in this Agreement).

H.     **New York.**  For a New York resident, for so long as the Employee resides in New York and is subject to the laws of New York: Paragraph 5.2(d) shall be modified so that Covered Customers excludes those customers who became a customer of Company as a result of Employee's independent contact and business development efforts with the customer prior to and independent from his/her employment with Company.

**Exhibit B, Page 17**

I.      **North Carolina**. For a North Carolina resident, for so long as Employee resides in North Carolina and is subject to the laws of North Carolina: the Look Back Period shall be calculated looking back two years from the date of enforcement and not from the date employment ends.

G.      **Oklahoma**.  For an Oklahoma resident, for so long as the Employee resides in Oklahoma and is subject to the laws of Oklahoma:  the noncompetition restriction in Paragraphs 5.2(a), (c), and (e) shall not apply (although the definition of Restricted Period and Look Back Period shall remain intact for purposes of the remaining provisions) and "Covered Customer" of the Company means individuals, companies, or business entities with which the Company has transacted business within the Look Back Period and with which the Employee had material business-related contact or about which the Employee had access to Confidential Information during the Look Back Period.

H.      **Wisconsin**.  For a Wisconsin resident, for so long as the Employee resides in Wisconsin and is subject to the laws of Wisconsin: (a) the tolling language in Paragraph 6.2 shall not apply; and (b) Paragraph 5.2(b) is rewritten as follows: During the term of employment and for one year after the Employee's termination of employment (whether voluntary or involuntary), Employee will not participate in soliciting any employee of the Company that is in a Sensitive Position to leave the employment of the Company on behalf of (or for the benefit of) a Competing Business, nor will Employee knowingly assist a Competing Business in efforts to hire such an employee away from the Company.  An employee in a "Sensitive Position" refers to an employee of the Company who is in a management, supervisory, sales, research and development, or similar role where the employee is provided Confidential Information or is involved in business dealings with the Company's customers.

## EXHIBIT B

### Notice Regarding Invention Assignment

1.     For an employee residing in **Illinois, Kansas, Delaware**, or **North Carolina**, you are hereby advised:

**Notice.** No provision in this Agreement requires Employee to assign any of his or her rights to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time, unless (a) the invention relates (i) to the business of the Company or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by Employee for the Company.  Delaware Code Title 19 Section 805; Illinois 765ILCS1060/1-3, "Employees Patent Act"; Kansas Statutes Section 44-130; North Carolina General Statutes Article 10A, Chapter  66, Commerce and Business, Section 66-57.1.

2.     For an employee residing in **California**, you are hereby advised:

**Notice.**  No provision in this Agreement requires Employee to assign any of Employee's rights to an invention if that invention qualifies for exclusion under California Labor Code §2870 which states: (a)  Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either: (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer, (b) to the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.  Cal. Lab. Code §2870.

3.     For an employee residing in **Washington**, you are hereby advised:

**Notice.** No provision in this Agreement requires Employee to assign any of his or her rights to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time, unless (a) the invention relates (i) directly to the business of the Company, or (ii) to the Company's actual or demonstrably anticipated research or development, or (b)

the invention results from any work performed by Employee for the Company. Washington Rev. Code, Title 49 RCW: Labor Regulations Chapter 49.44.140.

4.      For an employee residing in **Utah**, you are hereby advised:

**Notice.** No provision in this Agreement requires Employee to assign any of his or her rights to an invention which was created entirely on Employee's own time, and which is not (a) conceived, developed, reduced to practice, or created by Employee (i) within the scope of Employee's employment with the Company, (ii) on the Company's time, or (iii) with the aid, assistance, or use of any of the Company's property, equipment, facilities, supplies, resources, or patents, trade secrets, know-how, technology, confidential information, ideas, copy rights, trademarks and service marks and any and all rights, applications and registrations relating to them, (b) the results of any work, services, or duties performed by Employee for the Company, (c) related to the industry or trade of the Company, or (d) related to the current or demonstrably anticipated business, research, or development of the Company.  Utah Code Sections 34-39-1 through 34-39-3, "Employee Inventions Act."

5.      For an employee residing in **Minnesota**, you are hereby advised:

**Notice.** No provision in this Agreement requires Employee to assign any of his or her rights to an invention for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time, and (a) which does not relate (i) directly to the business of the Company, or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by Employee for the Company.  Minnesota Statutes 13A Section 181.78.

# Amendment to the Non-Competition, Non-Solicitation and Confidentiality Agreement

This Amendment is to the Non-Competition, Non-Solicitation and Confidentiality Agreement (the "Agreement") between Open Mortgage, LLC, a duly organized Texas limited liability company (the "Company") and Russ Allgier (the "Employee") dated April 17, 2019, signed by Scott Gordon for the Company on April 25, 2019 and signed by the Employee on April 18, 2019.  This Amendment shall be effective as of the last date written below the signature of each of the Parties.

The Company and the Employee together are referred to as the "Parties".

The Parties acknowledge the existence of the Agreement and the value that the terms of the Agreement brought and continue to bring to both Parties.  Specifically, the Employee acknowledges that the covenants contained in the Agreement are reasonable and necessary to protect the interests of the Company.

The Company and the Employee hereby agree to amend the Agreement through this Amendment.

### Changes to Section 5.2
The Company agrees to release the Employee from the Non-Competition requirements in Section 5.2 of the Agreement.

The Company further agrees to, in a very limited fashion, release the Employee from the Non-Solicitation restrictions in Section 5.2 of the Agreement.  In particular, the Company agrees that the Employee, should the Employee's employment with the Company be terminated (regardless of the reason or manner of termination), may solicit and/or communicate **solely** with non-operations staff from the branch where the Employee was employed as a Branch Manager.  Employee may not solicit or communicate with any other Covered Employee (as defined in the Agreement) for the purpose of persuading such Covered Employee to end or modify the Covered Employee's employment relationship with the Company.  For clarity, Covered Employee explicitly covers all Company Employees working in the Operations department of the Company whether located in the Branch or otherwise located in Rapid City, South Dakota or Cheyenne, Wyoming or Austin, Texas or working remotely.

All other terms and conditions of the Agreement remain in full force and effect, including but not limited to the confidentiality and enforcement provisions.

**Exhibit C, Page 1**

All other terms in this Amendment are as defined in the Agreement.

IN WITNESS WHEREOF, Company and Employee have caused their names to be signed below.

**Company**                                          **Employee**

_____                    _____
Scott Gordon                                         Russ Allgier
CEO/President
Open Mortgage, LLC

Date: _____                        Date: _____

**Exhibit C, Page 2**

## AFFIDAVIT OF SERVICE

| Case: | Court:<br>IN CIRCUIT COURT SEVENTH JUDICIAL CIRCUIT | County:<br>PENNINGTON, SD | Job:<br>5549062 (21-664) |
|---|---|---|---|
| Plaintiff / Petitioner:<br>RUSSELL ALLGIER | | Defendant / Respondent:<br>OPEN MORTGAGE, LLC | |
| Received by:<br>All Star Investigations LLC | | For:<br>GPNA | |
| To be served upon:<br>JAKE DROGE | | | |

I, Jon Harris, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:**   JAKE DROGE, 45776 263RD ST, HUMBOLDT, SD 57035

**Manner of Service:**   Personal/Individual, Apr 8, 2021, 3:06 pm CDT

**Documents:**   Summons (Received Apr 8, 2021 at 8:00am CDT), Complaint with Exhibits (Received Apr 8, 2021 at 8:00am CDT)

**Additional Comments:**
1) Successful Attempt: Apr 8, 2021, 3:06 pm CDT at 45776 263RD ST, HUMBOLDT, SD 57035 received by JAKE DROGE. Age: 40s ; Ethnicity: Caucasian; Gender: Male; Hair: Brown; Other: Glasses ;
Personal service

*Subscribed and sworn to before me by the affiant who is personally known to me*

_____
Notary Public

4-9-2021          9-23-21
Date          Commission Expires

_____        4-9-2021
Jon Harris          Date

All Star Investigations LLC
300 N. Dakota Ave. Suite 220
Sioux Falls, SD 57104
605-610-7750